UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                        PLAINTIFF

v.                                                 CRIMINAL ACTION NO. 3:05CR-151-S

DERL SEBASTIAN HAWK, et al.                                   DEFENDANTS

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the court on motions of defendants Deryl Sebastian Hawk, Dwayne Scott Hawk, Eddie Whitlow, and Stanley Todd Phillips to suppress wiretap evidence.  The court heard the parties on August 17, 2007 on the issue of entitlement to an evidentiary hearing pursuant to *U.S. v. Stewart,* 206 F.3d 295, 303-06 (6th Cir. 2002), *cert. denied, sub nom*, *Benford v. U.S.* 537 U.S. 1138 (2003), and *Franks v. Delaware*, 98 S.Ct. 2674 (1978).

Initially, a motion was filed by David Lee Richerson to suppress evidence obtained from the wiretap authorized for his cellular telephone.  The motion was held in abeyance at the request of the Richerson pending his negotiation of a plea agreement with the United States.  An agreement was reached and Richerson pled guilty in the case.  Over a year later, defendants Deryl Sebastian Hawk, Dwayne Scott Hawk, Eddie Whitlow, and Stanley Todd Phillips filed motions to adopt Richerson's motion to suppress, and further sought to apply the arguments in that motion to wiretaps of the cell phones of Dean Keith Hamblin and Deryl Sebastian Hawk.  Deryl Sebastian Hawk and Eddie Whitlow have also pled guilty in the case.

The United States concedes that all four defendants have standing to challenge the wiretaps in this case.  The defendants filed briefs supplementing Richerson's motion on the suppression issue. The defendants were first given the opportunity to argue the threshold question of entitlement to an evidentiary hearing.  The court concluded that no evidentiary hearing was mandated as no defendant

had made the required showing that there was a "false statement in the affidavit for the warrant that had been knowingly or recklessly made." *Franks, supra.*

We find on the written submissions that the affidavits for each of the wiretaps contains "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Rice*, 478 F.3d 704 (6th Cir. 2006), *quoting*, *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir.), *cert. denied*, 537 U.S. 1138, 123 S.Ct. 930, 154 L.Ed.2d 832 (2003), (*quoting*, 18 U.S.C. § 2518(1)(c)).   The Court of Appeals in *Rice* explained that "[a]ll that is required is that investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate." *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 64, 102 L.Ed.2d 42 (1988).

The investigation culminating in the arrests and indictments in this case spanned a number of states and involved many months of police work.   The wiretap authorizations, too, were issued over a number of months as the investigation continued and new suspects were identified.   The affidavit executed in support of each application contains case-specific analysis of alternative investigative techniques.   In the *Rice* case, the affidavit stated that certain investigative techniques had been attempted.   These statements were shown to be untrue.   We reiterate that there are no allegations of falsity in this case.   This case is therefore not comparable to *Rice*.

A.  Deryl Hawk Affidavit

In the July 2005 affidavit for the wiretap of Hawk's cell phone, the affiant recited that an undercover agent had been able to obtain an introduction to Hawk through a cooperating witness. The agent made three purchases of a substantial quantity of methamphetamine from him.   The agent recorded several telephone calls with Hawk concerning these purchases.   He stated that although he was able to make these purchases, he was unable to obtain any information through this contact with

- 2 -

Hawk concerning Hawk's source of supply or means of laundering proceeds.  The affiant stated that in his experience in drug trafficking investigations, drug traffickers will become suspicious of anyone whom they have not known for a long period of time.  He noted that the cooperating witness, who was a customer of Hawk, had not been invited to participate further in the organization's operation.  He also noted that in his experience in such investigations, suppliers of controlled substances do not communicate with customers and fringe individuals because they wish to avoid detection by law enforcement.  Therefore, the affiant concluded that further attempts at infiltration of the organization would be ineffective or dangerous.

The affiant also stated that physical surveillance had been used but with only limited success. He noted that Hawk lives on a dead end road in a rural area.  The residence is not visible from the roadway.  Therefore, effective physical surveillance at a safe distance had proved difficult due to a lack of nearby residences or outbuildings near which to conceal surveillance units.  Also, because of the dead end road, "drive by" surveillance was not possible.

Surveillance also proved difficult at Hawk's business due to his use of surveillance cameras and the location of the business on the outskirts of a small town.  "Drive by" surveillance was necessarily limited.  In any event, the affiant concluded that this investigative technique would not yield the information that they hoped to glean such as the organization's sources of supply, the scope of the organization, the identities of co-conspirators and customers, and their methods of laundering proceeds of drug activity.

The affidavit also articulated that pen registers, traps, traces, toll records and tracking devices would not yield the type of evidence necessary to determine the extent of the drug trafficking operation, sources of supply, and the like.  Trash searches were rejected for the same reasons that physical surveillance was not advisable.  The affiant sought to utilize electronic surveillance in lieu of search warrants, interviews of associates, and grand jury subpoenas which would most likely alert members of the organization of the investigation.

In sum, the detailed 36-page affidavit sufficiently described the history of the investigation, the evidence obtained to date, the methods of investigation previously employed as well as those methods considered and rejected, and the objects of further investigation to justify obtaining approval of the wiretap application.  There was no further challenge to the wiretap extension application beyond the challenges raised with respect to the articulation of necessity in the original affidavit.

## B.  Hamblin Affidavit

The application for the wiretap of Hamblin's cell phone was filed on August 12, 2005. Similar to the Hawk affidavit, it recites in extensive detail the history to date of the investigation. The affiant noted information from a confidential informant that methamphetamine base obtained in Oklahoma or Texas would be cooked with the final ingredients by Hawk, Hamblin, and York to produce crystal methamphetamine.  The affiant also related that on July 25, 2005, Task Force Officer Slaughter contacted Hawk seeking to purchase methamphetamine ICE.  Hawk told him that it would take a couple of hours to find out from his "guy" if it was available, and that he would have to see the individual in person, rather than contacting him by phone.  The wiretap of Hawk's cell phone revealed that immediately upon ending this call with Slaughter, Hawk called Hamblin's cell phone.  He received Hamblin's voice mail greeting, but Hawk did not leave a message.  An hour and a half later, a call was intercepted from Hawk's phone to his business phone in which  told his employee that he was "sitting over here at Deano's."  The affiant stated that "Deano" is a nickname for Dean Hamblin.  Fifteen minutes later, Hawk contacted Slaughter with a price for the drug.

The affiant stated that the interceptions from Deryl Hawk's cell phone during the previous thirty days showed that Hawk relied upon Hamblin as his source of supply.  The pen register analysis showed that there were 1,632 calls made or received from Hamblin's cell phone between July 20, 2005 and August 11, 2005.  The pen registers revealed seven calls between Hamblin's cell phone and Hawk's cell phone, thirteen calls from Hamblin's cell phone to Hawk's home phone, four

calls from Hamblin's cell phone to Hawk's business phone, twenty-one calls between Hamblin's cell phone and a number utilized by co-defendant Gary York, and thirty-five calls between Hamblin's cell phone and co-defendant David Richerson's cell phone.

The affidavit stated that undercover agents and cooperating witnesses were not in a position to be able to buy drugs directly from Hamblin.  They were not able to further infiltrate the organization beyond the purchases which had been made from Hawk.  For the same reasons as discussed in the Hawk affidavit, the affiant found that further attempts at undercover activity would be ineffective or would rouse suspicion in the organization.  The affiant also stated that it was his belief that Hawk had friends in the law enforcement community that might alert him to their undercover activity.

As with Hawk, Hamblin lives in a rural area where law enforcement could not conceal themselves and their operations, so physical surveillance was difficult and ineffective.  The affiant also noted that physical surveillance would not yield the type of evidence they were trying to obtain such as the identities and roles of co-conspirators, the full scope of the operation and the methods of laundering drug proceeds.

The affiant stated, similarly to the Hawk affidavit, that pen registers, traps, traces, toll records and tracking devices would not yield the type of evidence necessary to determine the extent of the drug trafficking operation, sources of supply, and the like.  Trash searches were rejected on the same bases as physical surveillance.  Electronic surveillance was considered preferable and more likely to afford the access to the evidence sought than search warrants, interviews of associates or grand jury subpoenas.  Additionally, concerns about Hawk's supposed contacts in the local law enforcement community and the potential that the investigation might be compromised played a role in determining whether various investigative techniques would be useful and or/advisable.

The 41-page affidavit sufficiently described all of the evidence to date, including the information which had been developed through the use of the Hawk wiretap.  The affidavit discussed

in detail the methods of investigation which had been used, and those which had not or could not be used and the reasons for those decisions. This evaluation and the articulation of the additional goals of the investigation provided ample justification for obtaining approval of the wiretap application. There has been no further challenge to the wiretap extension application beyond the challenges raised with respect to the articulation of necessity in the original affidavit.

### C. Richerson Affidavit

The application for a wiretap of Richerson's cell phone was filed on October 18, 2005. The application contains substantial detail concerning the ongoing investigation of drug trafficking activities of various individuals affiliated with the Iron Horsemen Motorcycle Club ("IHMC"). Richerson was the National President of the IHMC. It was found, through the wiretap of Hamblin's cell phone, that Richerson was kept informed concerning details of the drug operation during September and October of 2005. Intercepted conversations were said to involve information concerning the manufacture and availability of methamphetamine, and the supplying of methamphetamine to Richerson for his customers. Additionally, Hamblin discussed some issues relating to a particular supplier with Richerson. As the investigation broadened and more information was obtained, it was believed in September, 2005 that a new drug supplier had been found in Tennessee. Hamblin called him "Miguel." Law enforcement believed "Miguel" to be Raphael Acosta. The affiant stated that the purposes for the wiretap included gaining more information about Acosta and the suppliers, and a more complete picture of the extent and method of operation in the IHMC network.

During the period September 21, 2005 through October 11, 2005, Richerson made or received 782 calls on his cell phone. The pen register revealed forty-two calls between Richerson and Hamblin, and thirteen calls between Richerson and York, among others.

The affiant stated that physical surveillance had proven to be very difficult and of only limited success. The affiant related that nightime surveillance of Richerson's residence had been

attempted, but that they found a great deal of activity, including vehicles and motorcycles parked at the residence and individuals standing near the vehicles in the driveway.  The fact that the houses in his neighborhood were in close proximity to one another made it difficult to find a vantage point where law enforcement would not be detected by neighbors or by Richerson.

The affiant also stated that physical evidence would not yield the type of evidence they were trying to obtain concerning suppliers, other co-conspirators and the methods of drug trafficking and money laundering operations.

Pen registers, traps, traces and tolls were believed to be only of limited usefulness because the agents were seeking identities of individuals and other such information not discernable from investigative techniques such as these.  A pen register had been used on Richerson's cell phone, but affiant noted that this tool provides only investigative leads, not direct evidence of criminal activity.

The affiant noted concerns with interviews, search warrants and grand jury subpoenas which might compromise the related investigation being conducted in Nashville as well as the investigation in this district.  The affiant also stated that the Drug Enforcement Administration remained ready to attempt to install tracking devices on vehicles which were ascertained through intercepts or otherwise to be used to transport drugs, but that no such information had come to light.

Trash searches were rejected as too risky inasmuch as the Richerson house was located about 20 to 30 feet from the street.  The affiant stated that the risk of detection outweighed the potential usefulness of this technique with this target.

This 52-page affidavit sufficiently described the evidence to date, as well as the history of the investigation and the purposes for which the wiretap of Richerson's cell phone was sought.  The methods of investigation were full explored, the methods which had been used were described, and the ones rejected were throughly discussed.  The affidavit therefore justified the approval of the wiretap application.  There was no further challenge to the wiretap extension application beyond the challenges raised with respect to the articulation of necessity in the original affidavit.

- 7 -

For the reasons set forth herein, and the court being otherwise sufficiently advised, **IT IS HEREBY ORDERED AND ADJUDGED** that the motions of the defendants, Deryl Sebastian Hawk, Dwayne Scott Hawk, Eddie Whitlow, and Stanley Todd Phillips. to suppress wiretap evidence (DNs 152, 251, 253, 255, 259) are **DENIED**.

**IT IS SO ORDERED.**